IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 21, 2012 Session

## STATE OF TENNESSEE v. WILLIAM FRANKLIN ROBINETTE

**Appeal from the Criminal Court of Greene County**
**No. 10-CR-310     John F. Dugger, Jr., Judge**

**No. E2011-02688-CCA-R3-CD - Filed October 30, 2012**

William Franklin Robinette ("the Defendant") appeals his jury convictions for theft of property of $1,000 or more but less than $10,000 and theft of property of $10,000 or more but less than $60,000. He was sentenced as a multiple offender to an effective sentence of ten years and was fined $10,000. On appeal, he challenges the sufficiency of the evidence supporting his convictions and the length of his sentence. After a thorough review of the record and the applicable law, we affirm the Defendant's convictions and sentences.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P. J., and ALAN E. GLENN, J., joined.

Lindsey Lane, Greeneville, Tennessee, for the appellant, William Franklin Robinette.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Cecil Mills, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Factual and Procedural Background

A Greene County Grand Jury indicted the Defendant on two counts of theft of property of $10,000 or more but less than $60,000, a Class C felony.

Robby McCamey, an asphalt plant foreman with Summers-Taylor, testified at trial that he was the foreman on duty on April 14 and 15, 2010. He left work at approximately 5:00

p.m. on April 14 and returned at approximately 6:00 a.m. on April 15. Upon returning to work, he found "a trailer that was unlocked or had been opened and unlocked. We found out some tools were missing, a Bobcat was missing, a dove-tail was missing, and numerous tools." Someone from McCamey's office called the sheriff's department and used the company's G.P.S. software to track the Bobcat loader. That employee informed the sheriff's department of the Bobcat's whereabouts. McCamey's company eventually recovered "[t]he Bobcat, a torch, acetylene hoses, oxygen hose, valves and a few tools." McCamey stated that the Bobcat's fair market value was approximately $14,700 at the time that it was stolen. Additionally, the stolen acetylene hose and the cutting torch each had a fair market value of approximately $300 at the time that the items were stolen. McCamey denied giving anyone, including the Defendant, permission to take these items from the Summers-Taylor property.

On cross-examination, McCamey acknowledged that he did not have expert knowledge of the fair market value of the Bobcat. He denied, however, that the Bobcat's fair market value could be less than $10,000.

Carl Rush, a plant manager at Vulcan Materials, testified that Vulcan Materials is located immediately beside Summers-Taylor. He was working at the plant on April 14, 2010, and he left work at approximately 5:00 or 5:30 p.m. and returned the following morning at approximately 6:30 or 6:45 a.m. When he arrived on the morning of April 15, 2010, another employee informed him that a pickup truck was missing. Rush also discovered that several items that were in the truck also were missing, including a hard hat and a green body harness. He notified the sheriff's department, and the sheriff's department found and returned the truck and body harness the following day.

Rush estimated that the pickup truck's fair market value was approximately $8,000 to $9,000 at the time that it was stolen. He was not certain what the body harness's fair market value would have been, but he stated that a body harness usually costs approximately $250 to $350. He agreed that, for purposes of trial, the total value of all the stolen items from Vulcan Materials was under $10,000. He denied giving anyone permission to take the truck from the Vulcan Materials property.

George Robby Carroll testified that on the night of April 14, 2010, he was living at the home of the Defendant, Lisa Sommers, and Billie Ninabuck. Lisa Summers was the Defendant's girlfriend and Billie Ninabuck's mother. Billie Ninabuck was Carroll's girlfriend. At approximately midnight, Carroll and the Defendant drove in the Defendant's red S-10 truck to Summers-Taylor and Vulcan Materials for the purpose of acquiring a Bobcat. Carroll testified,

I went in and looked at a truck and started a truck. It didn't have a key in it. I tore the switch up to make it run with a screw driver and a hammer, and went down and hooked to a trailer and backed up next to the Bobcat. The trailer was right beside the Bobcat; hooked it up, moved it over and put the Bobcat on it; and I left.

Carroll identified the same Bobcat identified by McCamey as the Bobcat that he removed from Summers-Taylor. When he and the Defendant exited the property, the Defendant dropped off his truck at his residence and got into the stolen truck with Carroll. They drove to the home of Ricky Bowser, an individual who wanted to purchase the Bobcat. Carroll unloaded the Bobcat, and then he dropped off the trailer at another location. The Defendant and Carroll retrieved the Defendant's truck and then "stash[ed]" the stolen truck in Hawkins County. The Defendant was with Carroll at each point, and Carroll denied that anyone else was present with them. After they discarded the stolen truck, Carroll and the Defendant drove back to the Defendant's residence.

Carroll admitted that he had permission to operate the Defendant's red S-10 pickup truck. However, on the night in question, Carroll insisted that the Defendant was present with him. On the morning of April 15, 2010, Carroll awakened to police officers in his bedroom.

On cross-examination, Carroll acknowledged that he already had pleaded guilty to charges related to this incident. As part of his plea agreement, he had agreed to testify against the Defendant at trial. He received split confinement that included fifteen months of incarceration. Carroll also acknowledged that the Defendant had been upset with him because of Carroll's drug abuse problem. The Defendant had caught Carroll shortly after Carroll had injected an intravenous drug into his arm. The Defendant did not like the fact that Carroll was dating Ninabuck and abusing drugs.

Carroll identified a picture of the inside of Ninabuck's car. Carroll identified the following items located in the vehicle: "a screwdriver, a sanding pad, some teddy bears, a blanket, a pair of snips, a glove, [and] a little child's toboggan with a picture on it." He denied, however, that the screwdriver in the picture was the same screwdriver he used to start the truck that he stole. On redirect examination, Carroll also denied ever touching the acetylene hose and torch or even knowing that those items were in the Defendant's truck.

David Brown testified that his son was employed at Summers-Taylor in April of 2010. Also at that time, Brown owned a sixteen-foot, dove-tail trailer that he stored at Summers-Taylor. On April 15, 2010, Brown's son called him and asked if he had picked up his trailer. He replied that he had not, and his son informed him that the trailer was gone. Brown denied

giving anyone except his son permission to move his trailer. Brown stated that he would not have accepted anything less than $1,500 for the trailer at the time that it was stolen.

Angela Taylor, an employee at Summers-Taylor, testified that on April 15, 2010, McCamey asked her to search for the location of a Bobcat loader. At the time that she ran the G.P.S. program, McCamey was present as well as Toby Price, a deputy with the Greene County Sheriff's Department. The software retrieved information that the Bobcat had been powered on at 1:27 a.m. and also showed the locations where the Bobcat had been between the time it was powered on until the time of the G.P.S. retrieval. At the time that Taylor utilized the software, the Bobcat was located on Jackson Lane. On cross-examination, Taylor acknowledged that the address 7620 Baileyton Road was not on the report. However, 925 Old Baileyton Road was on the report.[1]

Toby Price, a patrolman with the Greene County Sheriff's Department, testified that his shift began at 7:00 a.m. on April 15, 2010. At approximately 7:17 a.m., he received a report of a theft at Summers-Taylor. While he was in route, he received a report of another theft that occurred at Vulcan Materials. When he arrived at Summers-Taylor, McCamey gave him a list of all the missing items there and showed him on a computer the location of the missing Bobcat. Officer Price reported to detectives that the Bobcat currently was located on Jackson Lane.

After speaking with McCamey at Summers-Taylor, Deputy Price spoke with Rush at Vulcan Materials. Rush informed him that they were missing a 2004 F-250 with several work items inside. Officer Price described the two properties as being enclosed by a chain link fence but that the fence does not divide the two properties. In other words, "if you can get into one [property], you can get into the other one."

After speaking with Rush, Officer Price began traveling to Jackson Lane. However, two other officers, Officer Quinn and Detective Randolph, arrived first and confirmed that the Bobcat, in fact, was there. He learned that Officer Quinn and Detective Randolph were going to a residence off of Baileyton Road, so he met them at that residence. When he arrived, Officer Quinn and Detective Randolph already were speaking with the Defendant. Officer Price noticed a pickup truck, and in the bed of the truck was an acetylene hose and a climbing harness. These items caught his attention because he had just inventoried missing items from Summers-Taylor and Vulcan Materials that matched their descriptions. Officer

---

[1] As discussed in later testimony, 7620 Baileyton Road was the Defendant's residential address. Detective Randolph later testified that, although 7620 Baileyton Road did not register on the GPS, Old Baileyton Road did register. Notably, Old Baileyton Road is located immediately behind the Defendant's residence.

Price reported his discovery to Detective Randolph. Detective Randolph asked the Defendant if the tools in the bed of the truck belonged to him, and the Defendant answered "yes." Officer Price acknowledged on cross-examination that he, himself, did not question the Defendant about who owned the tools.

Detective James Randolph, Greene County Sheriff's Department, testified that on April 15, 2010, he received a call to report to Barkley Lane. Soon thereafter, he received another call that a G.P.S. indicated that a missing Bobcat was at 90 Jackson Lane West. As soon as he arrived at 90 Jackson Lane, he observed a Bobcat sitting in the driveway and Rick Bowser scraping off a logo on the Bobcat. After speaking with Bowser, he traveled to 7620 Baileyton Road to pick up the Defendant and Carroll. Upon arriving at the residence, he woke the Defendant and Carroll and handcuffed both individuals. As he escorted them outside by the Defendant's truck, Detective Randolph asked the Defendant whose acetylene hose and torch were in the back of his truck. The Defendant answered that the items were his. Detective Randolph then removed the items from the truck, had the truck towed, and transported the Defendant and Carroll back to his office for questioning. At that point, Detective Randolph asked the Defendant again about the acetylene hose and informed the Defendant that it was stolen. According to Detective Randolph, the Defendant stated that he misunderstood and thought that Detective Randolph had said "rope." Detective Randolph responded that there was no rope in the back of the truck. Carroll admitted to Detective Randolph where he had left the trailer. Detective Randolph confirmed that, at some point later, he returned all the items back to the respective owners.

The State asked Detective Randolph if he determined why 7620 Baileyton Road did not show up on the G.P.S. report as one of the locations of the Bobcat in the early morning hours of April 15, 2010. Detective Randolph replied that Old Baileyton Road is located directly behind the Defendant's residence. On cross-examination, Detective Randolph denied questioning the Defendant about some logger chains in the back of his pickup. Upon further questioning, he stated that he could not "say for sure" that he asked him about the logger chains that day. He also agreed that, as far as he knew, the logger chains belonged to the Defendant. Detective Randolph stated that he believed that the Defendant helped Carroll accomplish the events in question.

The State rested its proof, and the Defendant moved for a judgment of acquittal. The trial court overruled the motion. The Defendant chose not to testify and did not call any witnesses. The jury deliberated and returned a conviction for theft of property of $10,000 or more but less than $60,000, and a conviction for theft of property of $1,000 or more but less than $10,000.

At the sentencing hearing, the State requested that the trial court sentence the Defendant at the top of sentencing range for a multiple offender, based on the existence of two enhancement factors. As the first enhancement factor, the State argued that the offenses involved more than one victim – Summers-Taylor, Vulcan Materials, and Brown, who left his trailer at Summers-Taylor. Second, the State contended that the Defendant was the leader in the commission of the offenses. As its support, the State relied on trial testimony that the Defendant was older than Carroll, gave Carroll advice, and provided the vehicle during the commission of the offenses. The State also asserted that no mitigating factors applied.

The Defendant denied the applicability of the two enhancement factors espoused by the State and instead argued the application of two mitigating factors. First, the Defendant contended that he neither caused nor threatened serious bodily injury. Second, he asserted that he played only a minor role in the offenses.

The trial court found that no mitigating factors applied in this case. The trial court applied the first enhancement factor, noting that three convictions existed that it did not consider in establishing the Defendant's range. The trial court also found that the theft at Summers-Taylor involved more than one victim, so it applied that enhancement factor as to the conviction of theft of $10,000 or more but less than $60,000. In considering the need for confinement, the trial court considered the Defendant's long history of criminal conduct and the failure of past attempts at rehabilitation. Additionally, the court gave great weight in its consideration "to avoid depreciating the seriousness of the offense [and to] provid[e] an effective deterrent to others."

In light of these findings, as to the conviction for theft of property of $1,000 or more but less than $10,000, the trial court sentenced the Defendant as a multiple offender to six years and imposed a fine of $5,000. For the conviction of theft of property of $10,000 or more but less than $60,000, the trial court sentenced the Defendant as a multiple offender to ten years to be served concurrently and imposed a fine of $5,000. Thus, the Defendant's total effective sentence was ten years in confinement with a fine of $10,000. The Defendant filed a motion for new trial, which the trial court subsequently denied. He now appeals, challenging the sufficiency of the evidence supporting his convictions and the length of his sentence.

Analysis

*Sufficiency of the Evidence*

The Defendant challenges the sufficiency of the evidence supporting both of his convictions. Specifically, he alleges that "[t]he jury failed to properly consider the credibility

of the witness, Robbie Carroll, an accomplice to the Defendant's charges." (citing State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984)). Furthermore, the Defendant contends that the accomplice testimony of Robbie Carroll lacked adequate corroboration.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. Id. Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

Pursuant to Tennessee Code Annotated section 39-14-103(2006), "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." A person commits a Class D felony if "the value of the property or services obtained is one thousand dollars ($1,000) or more but less than ten thousand dollars ($10,000)." Tenn. Code Ann. § 39-14-105(3) (2006). A person commits a Class C felony if "the value of the property

or services obtained is ten thousand dollars ($10,000) or more but less than sixty thousand dollars ($60,000)." Id. at § 39-14-105(4).

In Tennessee, it is well-established that an accomplice's uncorroborated testimony cannot be the sole basis of a defendant's conviction. State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004). Specifically,

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.

Id. (quoting State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001)). Generally, adequate corroboration is a determination left to the jury. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001).

The evidence at trial established that in the early morning hours of April 15, 2010, the Defendant and Carroll broke into Summers-Taylor and Vulcan Materials and obtained items from both properties.

McCamey, an employee at Summers-Taylor, testified that a Bobcat loader, an acetylene hose, a cutting torch, and other tools were missing when he arrived at work on the morning of April 15, 2010. He stated that the Bobcat's fair market value was $14,700 at the time that it was stolen. The stolen acetylene hose and cutting torch each had a fair market value of $300 at the time that the items were stolen. McCamey denied giving anyone, including the Defendant, permission to take these items from the Summers-Taylor property.

Brown testified that he had stored his "dove-tail" trailer on the Summers-Taylor property because his son was employed there. On April 15, 2010, his son called to inform him that his trailer was missing. Brown denied giving anyone except his son permission to use the trailer.

Carl Rush, a plant manager at Vulcan Materials, testified that when he arrived to work on the morning of April 15, 2010, he discovered that a company truck, a hard hat, and a green body harness were missing. Rush denied giving anyone permission to remove the truck or

its contents from the Vulcan Materials property. He estimated that the truck's fair market value was approximately $8,000 or $9,000 at the time that it was stolen and that the total value of the stolen items was an amount less than $10,000.

Carroll testified that at approximately 12:00 a.m. on April 15, 2010, he and the Defendant drove in the Defendant's truck to Summers-Taylor and Vulcan Materials for the purpose of acquiring a Bobcat. He stated that he put the Bobcat on a trailer, hooked the trailer to a truck on the properties, and then dropped off the Defendant's truck at the Defendant's residence. Carroll and the Defendant drove the Bobcat to the home of Ricky Bowser. After dropping off the Bobcat and retrieving the Defendant's truck, Carroll disposed of the stolen truck and trailer and went back with the Defendant to the Defendant's home. Carroll denied ever touching the acetylene hose and torch or even knowing that those items were in the Defendant's truck.

When viewed in a light most favorable to the State, the evidence is sufficient to support the Defendant's theft convictions. The jury was not restricted to relying solely on the accomplice testimony of Carroll in determining the Defendant's guilt. Rather, the testimony of Detective Randolph and Officer Price corroborated Carroll's testimony that the Defendant was involved in the thefts.

Officer Price testified that, upon arrival to the Defendant's residence, he noticed items in the bed of the Defendant's truck that matched the missing items from Summers-Taylor and Vulcan Materials. According to Officer Price, Detective Randolph asked the Defendant whether the tools in the bed of the Defendant's truck belonged to the Defendant, and the Defendant answered "yes." According to Detective Randolph, he asked the Defendant whose acetylene hose and torch were in the back of the Defendant's truck, and the Defendant responded that the items were his.

The Defendant highlights Detective Randolph's cross-examination testimony that he questioned the Defendant at a later point about the Defendant's ownership of the acetylene hose and informed the Defendant that the hose was stolen. According to Detective Randolph, the Defendant stated that he misunderstood and thought that Detective Randolph had said "rope." However, Detective Randolph responded to the Defendant that there was no rope in the bed of the truck.

We will not disturb the jury's findings as to the weight given to the testimony of Officer Price and Detective Randolph in corroborating Carroll's testimony. See Bland, 958 S.W.2d at 659. To the extent that the jury accredited the testimony that the Defendant acknowledged ownership of the items in the bed of his truck, including the items that were stolen, evidence exists outside of the accomplice testimony that "leads to the inference . . .

that the defendant is implicated in [the theft]." <u>Bough</u>, 152 S.W.3d at 464 (quoting <u>Bane</u>, 57 S.W.3d at 419).

In much the same way, to the extent the Defendant asserts that the jury should have discredited Carroll's testimony, we will not disturb the jury's implicit credibility findings. See <u>Winters</u>, 137 S.W.3d at 655. Thus, the evidence is sufficient for a jury to find the Defendant guilty of both theft convictions.

*Sentencing*

The Defendant also argues that his sentence is improper. When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. <u>State v. Susan Renee Bise</u>, __ S.W.3d ___, ___, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *17 (Tenn. Sept. 26, 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." <u>Id.</u> at __, *20. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." <u>Id.</u> Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See <u>State v. Carter</u>, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts. (2010); <u>see also</u> <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991).

In making its sentencing determination, a trial court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2006). The trial judge also should consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5) (2006).

In imposing a sentence within the appropriate range of punishment, a trial court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2) (2006). From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting Tenn. Code Ann. § 40-35-210(d)).

Of relevance to this case, the trial court considered the following factors to enhance the Defendant's sentence:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; [and]

(3) The offense involved more than one (1) victim[.]

Tenn. Code Ann. § 40-35-114 (1), (3) (Supp. 2008). In order to apply, enhancement factors must always be "appropriate for the offense" and "not already an essential element of the offense." Id.

As noted above, the trial court found the Defendant to be a Range II multiple offender, which carries a sentencing range on a Class C felony between six and ten years and a Class D felony between four and eight years. Tenn. Code Ann. §§ 40-35-106(c) (2006); 40-35-112(b)(3) - (4) (2006).

The trial court found that no mitigating factors applied in sentencing the Defendant for either conviction. Regarding the sentence for the conviction of theft of property of $10,000 or more but less than $60,000, the trial court applied the two enhancement factors cited above and sentenced the Defendant to ten years. The trial court specified the Defendant's convictions that existed in addition to those necessary to establish his range, including a conviction in 1984 of "secreting personal property" and convictions for theft of property and services in 1995.

The trial court also found that both Brown and Summers-Taylor were victims to this offense because Brown's trailer, which had been stored on the Summers-Taylor property, was stolen along with various items from Summers-Taylor. The Defendant contends and the State concedes that the trial court erred in applying this factor because the indictment for this offense listed only one victim – Summers-Taylor. Nevertheless, even without this enhancement factor, we conclude that the trial court did not abuse its discretion in sentencing the Defendant to a ten-year sentence, which is within the applicable range for a C felony. See Tenn. Code Ann. § 40-35-112(b)(3); Bise, 2012 WL 4380564, at *20.

As for the sentence for the conviction of theft of property of $1,000 or more but less than $10,000, the trial court applied only the enhancement factor based on the Defendant's "previous history of criminal convictions or criminal behavior." See Tenn. Code Ann. § 40-35-114(1). The trial court noted that the record did not support the application of the "more than one (1) victim" factor for the conviction related to the theft of property at Vulcan Materials. See id. § 40-35-114(3). After consideration of the appropriate factors, the trial court sentenced the Defendant to six years for this conviction.

In summary, the trial court sentenced the Defendant within the appropriate range for both convictions, and the record supports the trial court's sentence as within the purposes and principles of the Sentencing Act. Thus, the trial court did not abuse its discretion. Therefore, the Defendant is entitled to no relief on this issue.

## CONCLUSION

For the reasons articulated above, we affirm the Defendant's theft convictions, as well as his sentences for both convictions.

_____
JEFFREY S. BIVINS, JUDGE